REVISED NOVEMBER 16, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 9, 2009

Charles R. Fulbruge III
Clerk

No. 06-30262

SAFETY NATIONAL CASUALTY CORPORATION,

Plaintiff–Appellee,

LOUISIANA SAFETY ASSOCIATION OF TIMBERMEN–SELF INSURERS
FUND,

Intervenor Plaintiff–Appellee,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON; ET AL.,

Defendants,

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Defendant–Appellant.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Plaintiff–Appellant,

v.

SAFETY NATIONAL CASUALTY CORPORATION; LOUISIANA SAFETY
ASSOCIATION OF TIMBERMEN,

No. 06-30262

Defendants–Appellees.

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge, joined by JONES, Chief Judge, KING, JOLLY, DAVIS, WIENER, BARKSDALE, DeMOSS, BENAVIDES, STEWART, DENNIS, PRADO, SOUTHWICK, and HAYNES, Circuit Judges:

The basis for this interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is the district court's denial of a motion to compel arbitration of a contractual dispute among three insurers. We consider en banc whether the McCarran–Ferguson Act[1] authorizes state law to reverse-preempt the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention)[2] or its implementing legislation (Convention Act).[3] We conclude that it does not. We vacate the district court's order and remand for further proceedings.

---

[1] 15 U.S.C. §§ 1011-1115.

[2] June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

[3] Pub. L. No. 91-368, 84 Stat. 692 (1970) (codified at 9 U.S.C. §§ 201-208).

2

I

Louisiana Safety Association of Timbermen–Self Insurers Fund (LSAT) is, as its name implies, a self-insurance fund operating in Louisiana. It provides workers' compensation insurance for its members. Certain Underwriters at Lloyd's, London (the Underwriters) provided excess insurance to LSAT by reinsuring claims for occupational-injury occurrences that exceeded the amount of LSAT's self-insurance retention. Each reinsurance agreement contained an arbitration provision.

Safety National Casualty Corporation (Safety National) also provides excess workers' compensation coverage and alleges that in a loss portfolio transfer agreement, LSAT assigned its rights under the reinsurance agreements with the Underwriters to Safety National. The Underwriters refused to recognize the assignment, contending that LSAT's obligations were strictly personal and therefore non-assignable.

Safety National sued the Underwriters in federal district court. The Underwriters filed an unopposed motion to stay proceedings and compel arbitration. The district court initially granted that motion.

The Underwriters commenced arbitration proceedings with Safety National and LSAT; however, the parties could not agree upon how arbitrators were to be selected. The Underwriters then filed a motion to lift the stay in order to join LSAT as a party in the district court and to compel arbitration to resolve how to compose the arbitration panel. In response, LSAT moved to intervene, lift the stay, and quash arbitration. LSAT asserted that the arbitration agreements were unenforceable under Louisiana law.

While those motions were pending, the Underwriters filed a separate action against Safety National and LSAT seeking recovery of unpaid premiums under the policies. The district court consolidated the two actions.

The district court ultimately reconsidered its initial decision and granted LSAT's motion to quash arbitration. The district court concluded that although the Convention would otherwise require arbitration, a Louisiana statute[4] that has been interpreted to prohibit arbitration agreements in insurance contracts was controlling and reverse-preempted the Convention because of the McCarran–Ferguson Act.[5] The district court subsequently certified that the order embodying its rulings involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal pursuant to 28 U.S.C. § 1292(b) may materially advance the termination of the litigation. A panel of this court concluded that the McCarran–Ferguson Act did not cause the Louisiana statute under consideration to reverse-preempt the Convention or the Convention Act.[6] Rehearing en banc was granted, thereby vacating the panel opinion.[7] Because the McCarran–Ferguson Act does not

---

[4] LA. REV. STAT. ANN. § 22:868 (previously LA. REV. STAT. ANN. § 22:629).

[5] See generally U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 507 (1993) ("Ordinarily, a federal law supersedes any inconsistent state law. The first clause of [15 U.S.C. § 1012(b)] reverses this by imposing what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.").

[6] Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London, 543 F.3d 744 (5th Cir. 2008), vacated and reh'g en banc granted, 558 F.3d 599 (5th Cir. 2009).

[7] Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London, 558 F.3d 599 (5th Cir. 2009).

apply to the Convention, we vacate the district court's order and remand for further proceedings consistent with this opinion.

II

The Underwriters raise three issues: whether (1) the Convention is an "Act of Congress" within the meaning of the McCarran–Ferguson Act,[8] (2) the McCarran–Ferguson Act applies to international commercial transactions, and (3) the Convention takes precedence over the McCarran–Ferguson Act even if the latter applies to international transactions. Because our resolution of the first issue resolves the question presented in this interlocutory appeal, we do not reach the other issues pressed by the Underwriters. We are persuaded that state law does not reverse-preempt federal law in the present case for two related but distinct reasons: (1) Congress did not intend to include a treaty within the scope of an "Act of Congress" when it used those words in the McCarran–Ferguson Act, and (2) in this case, it is when we construe a treaty—specifically, the Convention, rather than the Convention Act—to determine the parties' respective rights and obligations, that the state law at issue is superseded.

The starting point of our inquiry is the statutory and treaty texts.[9] Here, the texts of the Convention, the Convention Act, and the McCarran–Ferguson

---

[8] 15 U.S.C. § 1012(b).

[9] See Medellín v. Texas, 128 S. Ct. 1346, 1357 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself.").

Act support the conclusion that the McCarran–Ferguson Act does not authorize Louisiana to reverse-preempt the Convention by means of contrary legislation prohibiting arbitration of disputes regarding contracts of insurance.

The Louisiana statute at issue provides:

> A.   No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state . . . shall contain any condition, stipulation, or agreement:
>
> . . . .
>
> (2)   Depriving the courts of this state of the jurisdiction of action against the insurer.
>
> . . . .
>
> C.   Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract.[10]

Although it is not clear from this provision's text that arbitration agreements are voided, Louisiana courts have held that such agreements are unenforceable because of this statute.[11]

---

[10] LA. REV. STAT. ANN. § 22:868.

[11] See Doucet v. Dental Health Plans Mgmt. Corp., 412 So.2d 1383, 1384 (La. 1982) ("Classification of the contract at issue as an insurance contract renders the arbitration provisions of that contract unenforceable under [Louisiana Revised Statutes § 22:868]."); see also McDermott Int'l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir. 1997) ("Compulsory arbitration clauses in certain insurance contracts are unenforceable in Louisiana because of [Louisiana Revised Statutes § 22:868] . . . ."); accord W. of Eng. Ship Owners Mut. Ins. Ass'n (Luxembourg) v. Am. Marine Corp., 981 F.2d 749, 750 n.5 (5th Cir. 1993) ("Louisiana has prohibited arbitration clauses in insurance policies" (citing LA. REV. STAT. ANN. § 22:868; Doucet, 412 So. 2d at 1384)).

The Louisiana statute, as so interpreted, conflicts with the United States's commitments under the Convention. The Convention states that each signatory nation "shall recognize an agreement in writing under which the parties undertake to submit to arbitration" their dispute "concerning a subject matter capable of settlement by arbitration."[12] The Convention contemplates enforcement in a signatory nation's courts, directing that courts "shall" compel arbitration when requested by a party to an international arbitration agreement, subject to certain exceptions not at issue in the present case:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.[13]

This treaty is the subject of the Convention Act. That Act states that the Convention "shall be enforced in United States courts in accordance with this chapter."[14] The Act additionally provides relevant definitions[15] and establishes federal court jurisdiction and venue.[16] The parties agree that requiring

---

[12] Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

[13] Id. art. II(3).

[14] 9 U.S.C. § 201.

[15] Id. § 202.

[16] Id. § 203-04.

arbitration of the present dispute in compliance with the Convention would contravene the Louisiana statute.

LSAT contends that the McCarran–Ferguson Act resolves this conflict in favor of the application of state law because the Louisiana statute regulates the business of insurance. The McCarran–Ferguson Act provides that "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."[17] The Act further provides, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ."[18] The McCarran–Ferguson Act thus allows state law to reverse-preempt an otherwise applicable federal statute because the McCarran–Ferguson Act does not permit an "Act of Congress" to be "construed to invalidate, impair, or supersede" state law unless the Act of Congress "specifically relates to the business of insurance."

For the purposes of the McCarran–Ferguson Act, neither the Convention nor the Convention Act specifically relates to the business of insurance. Nor do the Underwriters challenge the district court's conclusion that Louisiana Revised

---

[17] 15 U.S.C. § 1011.

[18] Id. § 1012(b); U.S. Dept. of Treasury v. Fabe, 508 U.S. 491, 507 (1993) (explaining that the first clause of [§ 1012(b)] mandates that state statutes "regulating the business of insurance" do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise).

Statutes § 22:868, when applied to disputes arising under reinsurance agreements between insurers, regulates the business of insurance within the meaning of the McCarran–Ferguson Act.[19] Accordingly, we will assume, without deciding, that the Louisiana statute regulates the business of insurance,[20] although the matter is not entirely free from doubt.[21] We, therefore, limit our

---

[19] 15 U.S.C. § 1012(b).

[20] See Fabe, 508 U.S. at 505 ("The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance. . . . [T]he actual performance of an insurance contract is an essential part of the 'business of insurance.'") (citation omitted).

[21] One of the criteria for determining whether a law regulates the business of insurance is whether it has the effect of spreading or transferring a policyholder's risk. See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982) (explaining that the "three criteria relevant in determining whether a particular practice is part of the 'business of insurance'" include "whether the practice has the effect of transferring or spreading a policyholder's risk," although "[n]one of these three criteria is necessarily determinative in itself"); cf. Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 338 (2003) (explaining, albeit in the context of ERISA, "that conditions on the right to engage in the business of insurance must also substantially affect the risk pooling arrangement between the insurer and the insured"). An argument could be made that, at least in theory, resolving claims in an arbitration rather than in a court or potentially before a jury does not substantially affect the risk pooling arrangement between the insurer and the insured. The Supreme Court has emphasized that arbitration agreements are forum-selection provisions and do not displace substantive rights afforded by a statute or other substantive law. See, e.g., Preston v. Ferrer, 128 S. Ct. 978, 987 (2008) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum." (omission in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985))); cf. Int'l Ins. Co. v. Duryee, 96 F.3d 837, 839-40 (6th Cir. 1996) (holding that a state statute revoking an insurer's license to do business if it exercised its right to remove a suit to federal court was not saved from preemption by the McCarran–Ferguson Act because the state statute "was not enacted so much 'for the purpose of regulating the business of insurance' as for the parochial purpose of regulating a foreign insurer's choice of forum and punishing the insurer for going into federal court"). However, in emphasizing that arbitration agreements generally should be enforced to preserve the parties' selection of the arbitral forum without regard to state laws mandating a judicial forum, the Supreme Court has said, "the [Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA")] not only 'declared a national policy favoring arbitration,' but

analysis to whether Louisiana law overrides the Convention's requirement that the present dispute be submitted to arbitration because we construe an act of Congress to invalidate, impair, or supersede state law.

## III

LSAT contends that the Convention was not self-executing and could only have effect in the courts of this country when Congress passed enabling legislation. Accordingly, LSAT argues that the Convention's enabling legislation is an "Act of Congress" within the meaning of the McCarran–Ferguson Act's provision that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the

---

actually 'withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 56 (1995) (quoting Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)).

It could also be argued that prohibiting the enforcement of arbitration agreements in contracts between an insurer and a reinsurer is not "necessary" to "protect policyholders," see generally Garcia v. Island Program Designer, Inc., 4 F.3d 57, 62 (1st Cir. 1993) (discussing Fabe and holding that Puerto Rico's filing deadline for proofs of claims against an insolvent insurance company did not regulate the business of insurance within the meaning of the McCarran–Ferguson Act because "it is neither directed at, nor necessary for, the protection of policyholders"), and that, at least in this context, the Louisiana statute's "connection to the ultimate aim of insurance is too tenuous," see Fabe, 508 U.S. at 509 ("The preferences conferred upon employees and other general creditors . . . do not escape pre-emption [by federal law] because their connection to the ultimate aim of insurance is too tenuous.").

We note that this court held in American Bankers Insurance Co. of Florida v. Inman, 436 F.3d 490 (5th Cir. 2006), that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), was reverse-preempted by the McCarran–Ferguson Act in the context of a dispute between an injured insured and his insurer regarding underinsured-motorist coverage governed by Mississippi law. We have no occasion to reconsider that holding today. The issue has not been presented in this appeal.

business of insurance . . . ."[22]  LSAT reasons that the Convention has no effect independent of legislation enabling it and that the McCarran–Ferguson Act requires us to construe the Convention's enabling legislation as reverse-preempted by the Louisiana statute.  LSAT concedes, however, that if the Convention is self-executing, it would be a treaty and not an Act of Congress within the meaning of the McCarran–Ferguson Act.

The Underwriters addressed whether the Convention is self-executing only in briefs to the panel and not in any depth, instead maintaining primarily that even if the Convention were not self-executing, once implemented, it remains a treaty and is not an "Act of Congress" within the meaning of the McCarran–Ferguson Act.

It is unclear to us whether the Convention is self-executing.  The Supreme Court's recent decision in Medellín v. Texas[23] instructs that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text."[24]  In Medellín, the Court examined the Vienna Convention on Consular Relations[25] and the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention[26] to determine whether a judgment of the International Court of Justice (ICJ) was "directly enforceable as domestic law in

---

[22] 15 U.S.C. § 1012(b).

[23] 128 S. Ct. 1346 (2008).

[24] Id. at 1357.

[25] Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

[26] Apr. 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487.

a state court in the United States."[27]  Considering the obligations imposed by Article 94 of the United Nations Charter in regard to those treaties, the Court concluded that it "does not provide that the United States 'shall' or 'must' comply with an ICJ decision, nor indicate that the Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts."[28]

Applying the reasoning of the Supreme Court in Medellín, we are to consider what the Convention says about its legal effect in domestic courts.  The Convention expressly states that domestic courts "shall" compel arbitration when requested by a party to an international arbitration agreement.[29]  The Convention additionally sets forth limited procedures to be followed in obtaining enforcement of an arbitration award.[30]  However, the Supreme Court indicated in dicta in Medellín that at least the provisions of the Convention pertaining to the enforcement of judgments of international arbitration tribunals are not self-executing.[31]  This reference in Medellín could be read to imply that the

---

[27] Medellín, 128 S. Ct. at 1353.  The United States had agreed to submit disputes arising out of the Vienna Convention to the ICJ, but the Supreme Court recognized that "submitting to jurisdiction and agreeing to be bound are two different things."  Id. at 1358.  The Court observed that the Optional Protocol "says nothing about the effect of an ICJ decision and does not itself commit signatories to comply with an ICJ judgment."  Id.

[28] Id. at 1358.

[29] Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(3), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

[30] See id. arts. III, IV.

[31] See Medellín, 128 S. Ct. at 1366 ("Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes.  The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress.  [citing 9 U.S.C. §§ 201-208] . . .  Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such

12

Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court's opinion.

Even if the Convention required legislation to implement some or all of its provisions in United States courts, that does not mean that Congress intended an "Act of Congress," as that phrase is used in the McCarran–Ferguson Act, to encompass a non-self-executing treaty that has been implemented by congressional legislation. Implementing legislation that does not conflict with or override a treaty[32] does not replace or displace that treaty.[33] A treaty remains an international agreement or contract negotiated by the Executive Branch and ratified by the Senate,[34] not by Congress. The fact that a treaty is implemented

---

a result." (citation omitted)); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974) (observing, although refusing to decide whether the Convention was self-executing, "Congress passed Chapter 2 of the United States Arbitration Act in order to implement the Convention" (citation omitted)).

[32] The later-in-time rule applies to resolve a conflict between a treaty and a statute. See Egle v. Egle, 715 F.2d 999, 1013 (5th Cir. 1983) ("Under our Constitution, treaties and statutes are equal in dignity. If a treaty and a statute are inconsistent, 'the one last in date will control the other . . . .'" (omission in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888))); see also Medellín, 128 S. Ct. at 1359 n.5 ("[A] later-in-time federal statute supersedes inconsistent treaty provisions."); Breard v. Greene, 523 U.S. 371, 376 (1998) (per curiam) ("'[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'" (quoting Reid v. Covert, 354 U.S. 1, 18 (1957) (plurality opinion))).

[33] See United States v. Percheman, 32 U.S. 51, 89 (1833) ("[The] understanding of the article [of the treaty] must enter into our construction of the acts of [C]ongress on the subject.").

[34] See U.S. CONST. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . .").

by Congress does not mean that it ceases to be a treaty and becomes an "Act of Congress."

To accept LSAT's argument, we must conclude that when Congress used "Act of Congress" in the McCarran–Ferguson Act, it intended that phrase to exclude self-executing treaty provisions but to include treaty provisions that are implemented by federal legislation. This is untenable. The commonly understood meaning of an "Act of Congress" does not include a "treaty," even if the treaty required implementing legislation. As noted above, LSAT concedes that if the provisions in the Convention directing courts to enforce international arbitration agreements were self-executing, then the McCarran–Ferguson Act would have no preemptive effect because self-executing treaties are not an "Act of Congress." Yet, there is no apparent reason—and LSAT has provided no rationale—why Congress would have chosen to distinguish in the McCarran–Ferguson Act between treaty provisions that are self-executing and those that are not self-executing but have been implemented.[35] We do not

---

[35] Congress does not appear to distinguish between self-executing and implemented, non-self-executing treaties when using the term "treaty" in a generally applicable sense, as shown by various statutes that were promulgated in the era when the McCarran–Ferguson Act was enacted. See Revenue Act of 1941, Pub. L. No. 77-250, sec. 109, 55 Stat. 687, 695 (1941) (amending certain provisions of the Internal Revenue Code to exclude the application of those sections to residents of certain countries "so long as there is in effect with such country a treaty which provides otherwise"); Farm Labor Supply Appropriation Act, Pub. L. No. 78-229, sec. 3, 58 Stat. 11, 13 (1944) (authorizing the War Food Administrator to enter into agreements with agricultural extension services of State colleges to furnish certain services to domestic interstate and foreign agricultural workers and to "require the modification or termination of any agreement with any such extension service whenever he finds such action to be necessary in order to carry out the terms of any treaty or international agreement to which the United States of America is signatory").

In other federal statutes that are currently in effect, it does not appear that Congress has used the term "treaty" to exclude implemented non-self-executing treaties. As an example, in our immigration laws, the term "immigrant" "means every alien except . . . an alien entitled

14

consider it reasonable to construe the term "Act of Congress" in the McCarran–Ferguson Act as an indication of congressional intent to permit state law to preempt implemented, non-self-executing treaty provisions but not to preempt self-executing treaty provisions.

Our conclusion that Congress did not intend the term "Act of Congress," as used in the McCarran–Ferguson Act, to reach a treaty such as the Convention is buttressed by the terms of the Convention Act. When Congress amended the FAA in 1970 to include provisions that dealt with the Convention, it provided in 9 U.S.C. § 203, that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." This is a direct indication that Congress thought that for jurisdictional purposes, an action falling under the Convention arose not only under the laws of the United States but also under treaties of the United States. Accordingly, even in the very act of Congress that was arguably necessary to implement the Convention in domestic courts, Congress recognized that jurisdiction over actions to enforce rights under the Convention did not arise solely under an "Act of Congress."

Equally important in the present case, it is a treaty (the Convention), not an act of Congress (the Convention Act), that we construe to supersede

_____

to enter into the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national . . . ." 8 U.S.C. § 1101(a)(15)(E). This provision would not seem to exclude a treaty that is non-self-executing but that has been implemented by an Act of Congress.

It would seem that "treaty" would include all implemented treaties, regardless of whether they were self-executing or had required implementing legislation. Yet, if we were to conclude that implemented non-self-executing treaties can be nothing more than an "Act of Congress," then none of the references to a "treaty" or "treaties" in the enactments we have discussed would include implemented, non-self-executing treaties. This is not a reasonable construction of these enactments.

Louisiana law.[36]   The Convention Act states that the Convention "shall be enforced in United States courts in accordance with this chapter."[37]   The Convention Act defines when an arbitration agreement "falls under the Convention"—principally when it is "commercial" and does not "aris[e] out of . . . a [legal] relationship which is entirely between citizens of the United States . . . unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."[38]   The Convention Act provides United States courts with jurisdiction over "[a]n action or proceeding falling under the Convention . . . regardless of the amount in controversy."[39]   But the Convention Act does not in this case operate without reference to the contents of the Convention.  It is the Convention under which legal agreements "fall";[40] it is an action or proceeding

---

[36] Cf. Humana Inc. v. Forsyth, 525 U.S. 299, 307-10 (1999) (defining "to invalidate" to mean "to render ineffective, generally without providing a replacement rule or law"; "to impair" to mean "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner"; and "to supercede" to mean "to displace (and thus render ineffective) while providing a substitute rule" (citations omitted)).

[37] 9 U.S.C. § 201.

[38] Id. § 202.  There is no doubt that the present dispute among three insurers arises out of legal relationships that are commercial.  We are not called upon to explore the outer bounds of what "commercial" legal relationships may encompass.

[39] Id. § 203.  LSAT does not argue that this jurisdictional statute, or other jurisdictional statutes such as 28 U.S.C. § 1331, invalidates, impairs, or supersedes Louisiana's law.  We look skeptically on a claim that the McCarran–Ferguson Act intended to deny diversity jurisdiction or federal question jurisdiction to federal courts in the state of Louisiana.  See Grimes v. Crown Life Ins. Co., 857 F.2d 699, 702-03 (10th Cir. 1988).

[40] 9 U.S.C. § 202; see also id. § 205 ("Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant . . . may, at any time before the trial thereof, remove such action

16

under the Convention that provides the court with jurisdiction;[41] such an action or proceeding is "deemed to arise under the laws and treaties" of the United States,[42] the treaty in this case being the Convention; and when chapter 1 of title 9 (the FAA) conflicts with the Convention, the Convention applies.[43]

The Convention Act directs us to the treaty it implemented, and when we "construe" the Convention, we are faced with the possibility of "superseding" the Louisiana law. The Convention requires that each signatory nation "shall recognize an agreement in writing under which the parties undertake to submit to arbitration" their dispute "concerning a subject matter capable of settlement by arbitration,"[44] and provides for direct enforcement in a signatory nation's courts, which "when seized of [a covered] action . . . shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null or void, inoperative or incapable of being performed."[45] The Convention itself contains defenses to the enforceability of an arbitration agreement by requiring that it is "in writing," regulates a "subject matter capable of settlement by arbitration," and is not "null and void, inoperative or

---

or proceeding to the district court of the United States . . . .").

[41] Id. § 203.

[42] Id. (emphasis added).

[43] Id. § 208 ("Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.").

[44] Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.

[45] Id. art. II(3).

incapable of being performed."[46] Accordingly, it is by reference to the Convention that we have a command—a judicially enforceable remedy—that we "supersede" Louisiana law unless there are defenses set forth in the Convention that counteract that command. Because here the Convention, an implemented treaty, rather than the Convention Act, supersedes state law, the McCarran–Ferguson Act's provision that "no Act of Congress" shall be construed to supersede state law regulating the business of insurance is inapplicable.

## IV

The dissent contends that an implemented non-self-executing treaty is not a treaty within the meaning of the Supremacy Clause and cannot preempt state law. With great respect, none of the Supreme Court decisions cited in the dissenting opinion so hold.[47]

---

[46] Id. art. II(1), (3). Plaintiffs have not raised various defenses to arbitrability that are available under the Convention. For example, the Supreme Court noted that "Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve 'subject matter capable of settlement by arbitration,' contemplates exceptions to arbitrability grounded in domestic law." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639 n.21 (1985). "Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope." Id. "Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention." Id. But the Court "decline[d] to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so." Id. (emphasis added).

[47] The single phrase from the Supreme Court's decision in Whitney v. Robertson, 124 U.S. 190, 194 (1888), on which the dissent relies, post at 4, n.11, cannot bear the weight assigned to it. The dissent quotes a passage from Whitney: "[w]hen [a treaty and legislation] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other; provided, always, the stipulation of the

The dissent quotes from the Ninth Circuit's decision in Hopson v. Kreps,[48] without providing the context of the quoted passages.[49] The Ninth Circuit observed in that case that an implementing statute should be given its plain meaning even if that interpretation conflicts with the treaty it implements.[50] The Ninth Circuit did not hold that an implemented treaty has no independent significance, as the dissent implies.[51]

---

treaty on the subject is self-executing." Id. at 194 (emphasis added). The Court was discussing the well-recognized principle of law that when a treaty and legislation passed by Congress conflict, the latter in time controls. The phrase italicized by the dissent only emphasizes that in the context of the sentence containing the phrase, the Court was referring to a self-executing treaty because a non-self-executing treaty that cannot be judicially enforced cannot override a statute. The discussion in Whitney does not consider whether an implemented non-self-executing treaty may supersede prior legislation, just as a self-executing treaty may.

Similarly, the dissent lifts quotations from Edye v. Robertson (Head-Money Cases),112 U.S. 580, 598-99 (1884), out of context. The Supreme Court held only that Congress may, through subsequent legislation, supersede a treaty that has "become the subject of judicial cognizance in the courts of this country." Id. at 599.

[48] 622 F.2d 1375 (9th Cir. 1980).

[49] Post at 11.

[50] Hopson, 622 F.2d at 1380 ("Thus, where courts have been persuaded as to the proper interpretation of an implementing statute, that judgment [regarding the intended meaning of the terms of the statute] has not been affected by the claim that the reading given the statute was inconsistent with the intent of the parties to the treaty.").

[51] The dissent additionally cites, post at 12, the concurring opinion in Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 879 (D.C. Cir. 2006) (KAVANAUGH, J., concurring) (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 cmt. h (1987) ("Strictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States.")). The majority opinion in Fund for Animals, Inc. held that if legislation conflicts with a treaty it implements, the implementing legislation controls. 472 F.3d at 879.

The dissent relies on a "consensus of legal scholars" regarding the status of implemented non-self-executing treaties.[52]  This "consensus" consists of one or two sentences in publications of relatively recent vintage, most of which provide no analysis or citation of authority.  The RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111, comment h (1987), is the earliest scholarly source cited by the dissent.  The Reporter for that RESTATEMENT was Professor Louis Henkin, arguably an advocate for the enforcement of implemented treaty provisions.[53]

Our court has exhibited an understanding that implemented provisions of a non-self-executing treaty can themselves be given effect by the courts as

---

[52] Post at 8-10.

[53] A discussion of self-executing and non-self-executing treaties appears in at least two of Professor Henkin's publications, L. Henkin, Foreign Affairs and the United States Constitution, 198-204 (2d ed. 1996); L. Henkin, Foreign Affairs and the United States Constitution, 156-161 (1972).  A footnote in the former contains the "[s]trictly" sentence that appears in comment h of the RESTATEMENT.  L. Henkin, Foreign Affairs and the United States Constitution, 200 n* (2d ed. 1996).  However, he wrote immediately following that sentence that "[s]ometimes the implementing legislation gives the treaty itself legal effect or incorporates it by reference."  Id.  Professor Henkin also opined:

> The difference between self-executing and non-self-executing treaties is commonly misunderstood. Whether a treaty is self-executing or not, it is legally binding on the United States.  Whether it is self-executing or not, it is supreme law of the land.  If it is not self-executing, Marshall said, it is not 'a rule for the court'; he did not suggest that it is not law for the President or for Congress.  It is their obligation to see to it that it is faithfully implemented; it is their obligation to do what is necessary to make it a rule for the courts if the treaty requires that it be a rule for the courts, or if making it a rule for the courts is a necessary or a proper means for the United States to carry out its obligation.

Id. at 203-204.

federal law.[54] The dissent concludes that we used "imprecise language" in each of these cases.[55] To the extent that is true, we note that the Supreme Court has used language similar to that which the dissent labels "imprecise."[56]

---

[54] See Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 902-03 (5th Cir. 2005) ("It goes without saying that, upon the United States signing a treaty and Congress adopting enabling legislation, the treaty becomes the supreme law of the land." (emphasis added)); McDermott Int'l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir. 1997) (refusing to decide "whether the Convention preempts La. R.S. 22:629" (emphasis added)); Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1145 (5th Cir. 1985) (holding that if an arbitration agreement qualifies, "the Convention requires district courts to order arbitration" (emphasis added)). Thus, "[b]ecause the United States is a signatory to the Convention, and Congress enacted enabling legislation, the Convention is applicable as federal law in this case." Lim, 404 F.3d at 903 (emphasis added).

[55] Post at 12.

[56] In common parlance, an implemented non-self-executing treaty provision can be "enforced" as the law of the land, and a non-self-executing treaty provision can become "domestic law" when implemented. The Supreme Court itself expressed these concepts in Medellín v. Texas, 128 S. Ct. 1346, 1356 (2008), although the precise question of whether an implemented treaty or its implementing legislation or both are given effect under the Supremacy Clause was not at issue. In Medellín, the Supreme Court said, "[w]hen, in contrast, '[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect.'" Id. (alteration in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888)). This indicates that in speaking of even non-self-executing treaties, it is commonly thought that treaty stipulations can themselves be enforced once implemented by legislation. Similarly, the Supreme Court said, "[i]n sum, while treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.'" Id. (citation omitted) (emphasis added). Here again, this statement exhibits a commonly-held conception that a treaty provision can itself become domestic law once implemented. See also id. at 1356 n.2 ("Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress."); id. ("[N]one of these treaty sources creates binding federal law in the absence of implementing legislation . . . ."); id. at 1369 (recognizing "two means . . . for giving domestic effect to an international treaty obligation under the Constitution," which are the making of a self-executing treaty and the implementation of a non-self-executing treaty).

However, we need not and do not undertake to determine the precise or technical contours of how or whether implemented non-self-executing treaty provisions become the "Law of the Land" under the Supremacy Clause. Our task in the present case is to determine if, in enacting the McCarran–Ferguson Act, Congress intended for state law to reverse-preempt federal law that has as its source an implemented non-self-executing treaty.

V

There is precedent that at the time of the McCarran–Ferguson Act's enactment, courts analyzed treaties, even when implemented by an Act of Congress, as treaties. The Supreme Court's decision in Missouri v. Holland[57] reflects that a treaty followed by implementing legislation remains a treaty that, where relevant, is viewed as distinct from an Act of Congress. The United States had consummated a non-self-executing treaty with Great Britain to protect migratory birds.[58] An act was passed giving effect to this treaty, directing the Secretary of Agriculture to promulgate regulations and prohibiting the killing of migratory birds except as permitted by regulations compatible with the treaty.[59] The State of Missouri sought to prohibit the enforcement of this Act and the Secretary's regulations, arguing that the statute interfered with rights reserved to the states by the Tenth Amendment.[60] The Court observed that "[a]n

---

[57] 252 U.S. 416 (1920).

[58] Id. at 431.

[59] Id. at 431-32.

[60] Id. at 430-31.

22

earlier act of Congress that attempted by itself and not in pursuance of a treaty to regulate the killing of migratory birds within the States had been held bad."[61] The Supreme Court, however, recognized a difference between acts of Congress under the Commerce Clause and "a treaty followed by such an act," as authorized pursuant to the Necessary and Proper Clause.[62] The validity of the implementing legislation under the Necessary and Proper Clause turned on the constitutionality of the treaty—even though it was implemented by an Act of Congress. The Court said,

> [w]hether the two cases cited [holding the prior Acts of Congress "bad"] were decided rightly or not they cannot be accepted as a test of the treaty power. Acts of Congress are the supreme law of the land only when made in pursuance of the Constitution, while treaties are declared to be so when made under the authority of the United States.[63]

The Court continued,

> [w]e do not mean to imply that there are no qualifications to the treaty-making power; but they must be ascertained in a different way. It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could . . . .[64]

---

[61] Id. at 432.

[62] Id. at 433.

[63] Id.

[64] Id.

The Court assumed that "but for the treaty the State would be free to regulate [migratory birds within its boundaries] itself."[65]  But the Court explained, "[v]alid treaties of course are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States."[66]  The Court continued, "[n]o doubt the great body of private relations usually fall within the control of the State, but a treaty may override its power."[67]  Because the treaty was constitutional, the Supreme Court ultimately concluded "that the treaty and statute must be upheld."[68]  The Supreme Court decided Holland in 1920, so when Congress passed the McCarran–Ferguson Act two decades later (and the Convention Act half a century later), it was well aware that a treaty, even if requiring implementation, was distinct from an Act of Congress and could serve as the source of authority to "override [a state's] power."[69]

We think it unlikely that when Congress crafted the McCarran–Ferguson Act, it intended any future treaty implemented by an Act of Congress to be abrogated to the extent that the treaty conflicted in some way with a state law regulating the business of insurance if Congress's implementing legislation did not expressly save the treaty from reverse-preemption by state law.  If this had been Congress's intent, it seems probable that Congress would have included a term such as "or any treaty requiring congressional implementation" following

---

[65] Id. at 434.

[66] Id. (citations and internal quotation marks omitted).

[67] Id.

[68] Id. at 435.

[69] Id. at 434.

"Act of Congress" and "such Act" in the McCarran–Ferguson Act.[70]  There is no indication in the McCarran–Ferguson Act that Congress intended, through the preemption provision and the use of the term "Act of Congress," to restrict the United States' ability to negotiate and implement fully a treaty that, through its application to a broad range of international agreements, affects some aspect of international insurance agreements.[71]

---

[70] 15 U.S.C. § 1012(b).

[71]  Cf. Am. Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003).  In American Insurance Association v. Garamendi, the Supreme Court considered whether a state law, aimed at aiding Holocaust victims by requiring insurers to disclose information about insurance policies sold in Europe before and during World War II, interfered with the federal government's conduct of foreign relations.  Id. at 401.  The President had entered into an executive agreement with Germany's chancellor in which the United States agreed that whenever a German company was sued in an American court regarding a Holocaust-era claim, the United States government would submit a statement that adjudicating such a claim was against the United States' "foreign policy interests."  Id. at 406.  The Supreme Court observed that "[g]enerally, . . . valid executive agreements are fit to preempt state law, just as treaties are, and if the agreements here had expressly preempted laws like [California's law], the issue would be straightforward."  Id. at 416-17 (footnote omitted).  Because an implied conflict existed, the Court ultimately concluded that the state law was preempted.  Id. at 420-27.  In addressing California's argument that in the McCarran–Ferguson Act "Congress authorized state laws of [the] sort [California had enacted]," the Court said,

> As the text itself makes clear, the point of McCarran–Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised. . . . [A] federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.

Id. at 427-28.  Although addressing an executive agreement, not a treaty, the Court's holding is nonetheless relevant here.  The Court signaled that the McCarran–Ferguson Act is focused on "implied preemption by domestic commerce legislation," not executive conduct in consummating foreign agreements.  Of course, in this case, we are dealing with the President's treaty-making authority, the Senate's treaty-approval authority, and Congress's authority to implement or facilitate such a treaty pursuant to the Necessary and Proper Clause.  See U.S. CONST. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ."); Missouri v. Holland, 252 U.S. 416, 432 (1920) ("If the treaty is valid there can be no

25

VI

Our conclusion that referral to arbitration is proper in this case is bolstered by the congressionally sanctioned national policy favoring arbitration of international commercial agreements. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,[72] the Supreme Court considered the "arbitrability, pursuant to the Federal Arbitration Act and the [Convention], of claims arising under the Sherman Act and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction."[73] The Court held such claims were arbitrable.[74] It emphasized that "[a]s international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade."[75] The Court admonished:

> If they are to take a central place in the international legal order, national courts will need to "shake off the old judicial hostility to arbitration," and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at least, it will be necessary for national courts to

---

dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government.").

[72] 473 U.S. 614 (1985).

[73] Id. at 616 (citations omitted).

[74] Id. at 626-27.

[75] Id. at 638.

> subordinate domestic notions of arbitrability to the
> international policy favoring commercial arbitration.[76]

In the process, the Supreme Court explained that "not . . . all controversies implicating statutory rights are suitable for arbitration."[77] In determining which are not, the Court said,

> "[j]ust as it is the congressional policy manifested in the
> Federal Arbitration Act that requires courts liberally to
> construe the scope of arbitration agreements covered by
> that Act, it is the congressional intention expressed in
> some other statute on which the courts must rely to
> identify any category of claims as to which agreements
> to arbitrate will be held unenforceable.[78]

The Supreme Court explained that federal antitrust law did not show such a congressional intent. Importantly, the Court said, "[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history."[79] We discern no such deducible intent in the McCarran–Ferguson Act.

Although the McCarran–Ferguson Act embodies a strong policy that the states have an interest in the regulation of the business of insurance, concerns that a state's regulatory policies regarding such contracts may not be recognized in an international arbitration are ameliorated by the substantive provisions in

---

[76] Id. at 638-39 (quoting Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 985 (2d Cir. 1942)).

[77] Id. at 627.

[78] Id. (emphasis added).

[79] Id. at 628.

the Convention and are not a basis for refusing to require that an arbitration go forward. As the Supreme Court observed in Mitsubishi with regard to the substance of federal antitrust law, "[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed."[80] The same is true of substantive Louisiana law that applies to the reinsurance agreements presently at issue.

## VII

We are aware that our decision conflicts with that of the Second Circuit in Stephens v. American International Insurance Co.[81] That case held that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation."[82] The Second Circuit concluded that Congress's "implementing legislation [did] not preempt"[83] a Kentucky statute that "subordinated" all "choice of law or arbitration provisions" in a contract to which an insolvent insurer in liquidation proceedings was a party.[84] The court

---

[80] Id. at 638. The Court observed that "[w]hile the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them." Id.

[81] 66 F.3d 41 (2d Cir. 1995).

[82] Id. at 45.

[83] Id.

[84] Id. at 43.

reasoned that "when the terms of [a treaty] import a contract—when either of the parties engage[s] to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court."[85]  The court then quoted the "[n]o Act of Congress" provision in the McCarran–Ferguson Act and said, "[a]ccordingly, the implementing legislation does not preempt the Kentucky Liquidation Act."[86]

We agree, of course, that when provisions of a treaty are not self-executing, they cannot be enforced in a court in this country unless and until those provisions are implemented by Congress.  But, we submit, this does not answer the question of what Congress intended when it used the terms "[n]o Act of Congress" and "such Act" in the McCarran–Ferguson Act or why Congress would have addressed only treaties that required implementation by Congress.  The text of the McCarran–Ferguson Act does not support the inclusion by implication of "a treaty implemented by an Act of Congress."  Because we give the phrases "Act of Congress" and "such Act" their usual, commonly understood meaning, we conclude that implemented treaty provisions, self-executing or not, are not reverse- preempted by state law pursuant to the McCarran–Ferguson Act.  We find no indication from the text of the McCarran–Ferguson Act that Congress intended to signal a distinction between self-executing and non-self-executing-but-implemented treaties in the McCarran–Ferguson's reverse-preemption clause.

---

[85] Id. at 45.

[86] Id.

We also note that the reasoning of the Second Circuit in Stephens v. American International Insurance Co. is at least in tension with that of its subsequent decision in Stephens v. National Distillers & Chemical Corp.,[87] in which the Second Circuit held that the McCarran–Ferguson Act did not cause a state law requiring out-of-state insurers to post security before participating in court proceedings to preempt the Foreign Sovereign Immunities Act.[88] In support of its first alternative ground for that holding, the Second Circuit reasoned that it must "apply federal law to the insurance industry, in spite of the McCarran–Ferguson Act, whenever federal law clearly intends to displace all state laws to the contrary."[89] The McCarran–Ferguson Act does not "force a federal law that clearly intends to preempt all other state laws to give way simply because the insurance industry is involved."[90] In a footnote appended to this statement, the court concluded that because an additional, alternate ground (that international law preempted the state insurance law before the passage of both the McCarran–Ferguson Act and the Federal Sovereign Immunities Act) supported its holding, it "need not consider whether [its decision to apply federal law when it was clearly intended to displace all state law] is in conflict with the holding in [Stephens v.] American [International Insurance Co.]."[91]

---

[87] 69 F.3d 1226 (2d Cir. 1995).

[88] Id. at 1231.

[89] Id. at 1233.

[90] Id.

[91] Id. at 1233 n.6.

In sum, the McCarran–Ferguson Act does not cause Louisiana Revised Statutes § 22:868 to reverse-preempt the Convention with regard to the dispute before us.

## VIII

We finally consider Safety National's request that we affirm the district court's ruling that the rights under the policies are assignable. The order embodying that ruling, dated August 13, 2003, has not been certified by the district court under 28 U.S.C. § 1292(b). We therefore lack appellate jurisdiction to consider it.[92]

*       *       *

We VACATE the district court's order denying the motion to compel arbitration and REMAND for further proceedings consistent with this opinion.

---

[92] See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) ("The court of appeals may not reach beyond the certified order to address other orders made in the case.").

EDITH BROWN CLEMENT, Circuit Judge, concurring in the judgment:

I would hold that the relevant treaty provision, Article II of the Convention, is self-executing and that it therefore preempts Louisiana Revised Statute § 22:868 by virtue of the Supremacy Clause. This result is dictated by the decisions of the Supreme Court, most recently in Medellín v. Texas, 552 U.S. 491, 128 S. Ct. 1346 (2008), differentiating self-executing from non-self-executing treaty provisions. The conclusion that Article II is self-executing possesses the added benefit of avoiding a difficult constitutional question,[1] namely what preemptive effect (if any) non-self-executing but implemented treaty provisions have under the Supremacy Clause. The majority is convinced that such treaty provisions have full preemptive effect, proceeding on the assumption that Article II is not self-executing. The dissent, meanwhile, persuasively refutes the majority's answer to the constitutional question, but its disposition relies on a finding that no provision of the Convention is self-executing. Neither opinion confronts the important antecedent question whether Article II is in fact self-

---

[1] "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." Ashwander v. Tenn. Valley Authority, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Although this principle is commonly invoked as the canon of avoidance in statutory construction, see Clark v. Martinez, 543 U.S. 371, 381 (2005) (describing the canon as "a tool for choosing between competing plausible interpretations of a statutory text"), courts, including this one, have also interpreted treaties to avoid constitutional questions. See, e.g., Parretti v. United States, 122 F.3d 758, 769 (9th Cir. 1997), rev'd en banc on other grounds, 143 F.3d 508 (9th Cir. 1998) (en banc); Caltagirone v. Grant, 629 F.2d 739, 747-48 (2d Cir. 1980); cf. Hidalgo County Water Control and Improvement Dist. No. 7 v. Hedrick, 226 F.2d 1, 6-7 (5th Cir. 1955) ("'We should seek to avoid, if possible, a decision adjudging a treaty to be in conflict with the Constitution. It is not necessary to a decision in this case for us to pass upon the question of whether the treaty is violative of the prohibitions of the Federal Constitution, as we would be compelled to do if the treaty required the construction contended for by Appellants.'" (quoting Amaya v. Stanolind Oil & Gas Co., 158 F.2d 554, 557 (5th Cir. 1946))).

executing.[2] The opinions' contrasting interpretations of the Supremacy Clause are unnecessary to decide the case because the plain text of Article II of the Convention compels a finding of self-execution.

In Medellín, the Court "recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." 128 S. Ct. at 1356. The Court traced this distinction to Foster v. Neilson, in which Chief Justice Marshall explained:

> Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties

---

[2] Contrary to the dissent's conclusion, the Underwriters have not waived the self-execution argument. In their opening brief to the panel, they contended that the treaty provision was self-executing by stressing their reliance "solely upon the provisions of Article II of the Convention . . . and not on any special implementing legislation." Appellant Br. 33 n.17. That this argument was presented to the panel is plainly reflected in its opinion. Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London, 543 F.3d 744, 749 (5th Cir. 2008), vacated and reh'g en banc granted, 558 F.3d 599 (5th Cir. 2009) ("The Underwriters maintain that the Convention was ratified after the McCarran-Ferguson Act was enacted and that in any event, the Convention is self-executing, which means that it did not require an act of Congress to have effect in United States courts. The Underwriters assert that a 'later-in-time self-executing treaty supercedes a federal statute if there is a conflict.'" (emphasis added)).

In addition, none of the cases cited by the dissent establishes that a party suffers waiver should it fail to repeat to the en banc court every argument that it made to the panel. Further, read in context, the language taken by the dissent from the Underwriters' en banc reply brief does not concede the self-execution point. As the section heading preceding that language makes clear, the Underwriters addressed the "primary" question "[p]osed by the [p]anel." Appellant En Banc Reply Br. 6. Underwriters should not be penalized for focusing their en banc briefing on the major issue addressed by the panel. Relatedly, LSAT cannot complain that it lacks notice of self-execution as a ground for disposition because its en banc brief understands the self-execution question to be contested, urging the court to "find . . . that the Convention was not self-executing." Appellee En Banc Br. 27-40.

engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court.

27 U.S. (2 Pet.) 253, 314 (1829). That non-self-executing provisions depend upon congressional implementing legislation to take effect as enforceable domestic law was recognized as early as Whitney v. Robertson, 124 U.S. 190, 194 (1888) ("When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect . . . ."). Self-executing provisions, on the other hand, "require no legislation to make them operative" and "have the force and effect of a legislative enactment." Id.

The text of the relevant treaty provision, Article II, provides:

> 1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
> 2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.
> 3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Medellín provides lower courts with a framework for determining whether treaty provisions are self-executing. The Court made clear that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." Medellín, 128 S. Ct. at 1357; see id. at 1361-62 (identifying "explicit textual expression" as the focus of the self-execution analysis). Although the Supreme Court has never expressly held that individual treaty provisions may be self-executing, while a treaty in its entirety may not be, its case law leads inescapably to this conclusion. As early as Whitney, the Court differentiated between the two types of provisions:

> When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment.

124 U.S. at 194. More recently, the Medellín Court noted its "obligation to interpret treaty provisions to determine whether they are self-executing." 128 S. Ct. at 1362 (emphases added).[3]

Of particular concern here is Section 3 of Article II, which provides that domestic courts, upon request of a litigant, shall enforce any arbitration agreement to which that litigant is a party by referring the parties to

---

[3] This court has reached a similar conclusion. See United States v. Postal, 589 F.2d 862, 878 (5th Cir. 1979) (recognizing the United States's capacity to enter into a multilateral treaty containing provisions which do not require implementing legislation). The fact that other, unrelated provisions of the Convention could be read to contemplate future legislative implementation—Articles X and XI, for instance—does not render the entire treaty non-self-executing, especially when the plain text of Article II counsels to the contrary.

arbitration. Section 3 is addressed to the courts of Contracting States, not to the States themselves or to their respective legislatures.[4] Further, Section 3 provides that a "court . . . shall . . . refer the parties to arbitration." Referral to arbitration is mandatory, not discretionary. Treaty provisions setting forth international obligations in such mandatory terms tilt strongly toward self-execution. See id. at 1358, 1359 n.5 (distinguishing between treaty language that constitutes a commitment to future action, such as "undertakes to comply," and treaty language using "shall" or "must").

The text of Article II constitutes "a directive to domestic courts." Id. at 1358 (identifying the failure of Article 94 of the United Nations charter to include a directive to domestic courts as a basis for a finding of non-self-execution). It leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes; instead, that rule is enforceable by the Convention's own terms.[5] See

---

[4] Article II, Section 1 does contain a reference to Contracting States, which provides that such States "shall recognize" arbitration agreements. Any suggestion that this reference renders Article II non-self-executing is overcome by the fact that Section 3 sets forth a specific mechanism—enforcement by referral to arbitration—and tasks the courts of Contracting States, and not their legislatures, with accomplishing that recognition.

[5] There is a plausible argument that the "null and void" language of Article II, Section 3 would permit a domestic court to refuse to enforce an arbitration agreement because of a contrary state law such as § 22:868. However, in Scherk v. Alberto-Culver Co., the Supreme Court heeded the "concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." 417 U.S. 506, 520 n.15 (1974). Further, in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., the Court acknowledged that Congress could carve out "categories of claims it wishes to reserve for decision by our own courts," but made no mention of individual states' capacity to do so. 473 U.S. 614, 639 n.21 (1985). It follows that whatever Congress's ability to specify when an arbitration agreement is "null and void," a state law is powerless to undermine the "utility of the Convention in promoting the process of international commercial arbitration." Id.

Foster, 27 U.S. at 314 (declaring a treaty to be self-executing "whenever it operates of itself without the aid of any legislative provision"). In the Head Money Cases, the Supreme Court explained that when a treaty provision addresses "rights . . . of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute." Edye v. Robertson, 112 U.S. 580, 599 (1884) [Head Money Cases]; id. at 598-99 ("A treaty, then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined."). The terms of Article II do not merely describe arbitration rights which are "of a nature to be enforced in a court of justice," but expressly instruct courts to enforce those rights by referring the parties to arbitration. In short, Article II of the Convention is self-executing and fully enforceable in domestic courts by its own operation.[6] It is entitled to recognition as "the

---

[6] The Medellín Court pointed out that in prior cases, in addition to a treaty's text, it had "also considered as 'aids to [a treaty's] interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." 128 S. Ct. at 1357 (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226 (1996)); see also Air France v. Saks, 470 U.S. 392, 396 (1985) ("Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." (emphasis added) (quotation and alteration omitted)). Because the treaty text is clear, I see no need to rely on such extratextual "aids" to interpret its meaning.

I would note, however, that the existence of the Convention Act is not inconsistent with a finding that Article II is self-executing. On July 31, 1970, Congress passed the Convention Act; the United States acceded to the Convention on September 30, 1970, and its accession entered into force on December 29, 1970. That Congress acted prior to accession taking effect suggests that the Convention Act was intended to establish limitations upon the enforcement of the Convention in domestic courts before it would otherwise take effect. See Whitney v. Robertson, 124 U.S. 190, 194 (1888) ("Congress may modify [self-executing] provisions, so far as they bind the United States, or supersede them altogether."); Head Money Cases, 112 U.S. at 599 ("[S]o far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or repeal.").

supreme Law of the Land" under the Supremacy Clause. U.S. CONST. art. VI, cl. 2.

Certain references to the Convention and Convention Act by the Medellín Court, the Second Circuit, and this court arguably support a contrary position. I briefly explicate why this is not the case. In Medellín, the Court cited the Convention Act for the proposition that "[t]he judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress." Medellín, 128 S. Ct. at 1366. It went on to state: "Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result." Id. The majority construes this dictum narrowly, opining that it "could be read to imply that the Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court's opinion." I would conclude that the dictum offers little support for the view that the Convention is non-self-executing in all respects.

Importantly, Medellín itself concerned the enforceability of a judgment of the International Court of Justice. See id. at 1356 ("The question we confront here is whether the Avena judgment has automatic domestic legal effect such that the judgment of its own force applies in state and federal courts." (emphasis in original)). The Court's dictum cited the Convention Act as an exemplar of Congress's ability to accord "domestic effect" to the judgments of similar international tribunals. The United States's obligation to "recognize arbitral awards as binding" is set forth in Article III of the Convention.[7] It was therefore

---

[7] Article III states, in full:
Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of

Article III, and not Article II, that the Medellín Court was addressing. Unlike Article II, Article III contains no language addressed to the courts of Contracting States and instead addresses itself only to the Contracting States themselves. The "international obligation[]" to which Congress was according "domestic effect" was therefore the one spelled out in Article III: the recognition of arbitral awards as binding and enforceable. That Congress would perceive a need to enact implementing legislation to render Article III enforceable in domestic courts says nothing about Article II's self-execution status, especially where, unlike Article II, Article III lacks an explicit directive to "[t]he court of a Contracting State." I would not read the Medellín Court as having indicated that the Convention is non-self-executing.

Meanwhile, the Second Circuit, in Stephens v. American International Insurance Co., concluded that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation." 66 F.3d 41, 45 (5th Cir. 1995). The court, however, undertook no textual analysis and set forth no reasons to support its conclusion. Moreover, the case was decided before Medellín, which provides critical guidance to lower courts for determining when treaty provisions are self-executing. Similarly, other panels of this court appear to have concluded that the treaty, as a whole, was enforceable only after

procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

Congress passed the Convention Act.[8]  Again, these decisions predate the instructions set forth in Medellín and do not appear to have specifically considered the text of Article II.

Although there may be a growing judicial consensus that multilateral treaties are presumptively non-self-executing, my conclusion that Article II of the Convention is self-executing is compelled by a straightforward application of binding Supreme Court precedent.  The majority and dissent bypass the self-execution question.  I would instead hew, as we must, to the plain language of Medellín and conclude that Article II is self-executing.

Because Article II of the Convention mandates enforcement of arbitration agreements, it conflicts with and therefore preempts Louisiana law.  On this basis, I would vacate the district court's denial of the motion to compel arbitration and remand for further proceedings.

---

[8] See Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 903 (5th Cir. 2005) ("Because the United States is a signatory to the Convention, and Congress enacted enabling legislation, the Convention is applicable as federal law in this case."); Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1145 (5th Cir. 1985) ("The Convention was negotiated pursuant to the Constitution's Treaty power.  Congress then adopted enabling legislation to make the Convention the highest law of the land.").

JENNIFER WALKER ELROD, Circuit Judge, with whom JERRY E. SMITH and EMILIO M. GARZA, Circuit Judges, join, dissenting:

Today the court concludes that an Act of Congress is not really an Act of Congress. In doing so, it holds that a non-self-executing treaty,[1] the Convention on the Recognition and Enforcement of Foreign Arbitral Awards[2] (Convention), preempts a state law. Because a non-self-executing treaty cannot itself provide a rule of decision in U.S. courts, the only candidate for a source of federal law with preemptive force under the Supremacy Clause is the statute that implements the treaty. The McCarran-Ferguson Act[3] requires that federal statutes that affect the business of insurance do so explicitly. The implementing statute does not do so, and it is therefore powerless to preempt state law. For this reason, the district court ruled correctly, and I respectfully dissent.

I.

The court errs today in what should have been an exercise in garden-variety statutory interpretation: instead of answering the question of whether the legislation implementing the Convention (the Convention Act)[4] is an "Act of Congress" within the meaning of the McCarran-Ferguson Act, the court frames its approach[5] as an inquiry into whether the Convention itself is an

---

[1] The question of whether or not the treaty is self-executing is not before the court. See infra note 31.

[2] The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. (Convention).

[3] 15 U.S.C. §§ 1011–15.

[4] 9 U.S.C. §§ 201–208.

[5] See Op. at 5 ("[I]t is when we construe a treaty . . . that the state law at issue is superseded."); Op. at 16 ("[I]t is a treaty (the Convention), not an act of Congress (the

41

Act of Congress. The court no longer explicitly endorses the panel's dubious "hybrid" holding that "the treaty followed by the implementing legislation must be considered as the sum of its parts, not piecemeal."[6] However, the court's failure to ask the right question at the outset inevitably leads to its incorrect conclusion—that the Convention itself, a non-self-executing treaty, preempts the Louisiana statute.[7] This holding is a doctrinal novelty of our circuit's own creation, as there is no precedent holding that a non-self-executing treaty, in and of itself, has the power to preempt state law. The court's trail-blazing holding also creates a circuit split with the Second Circuit and goes against other circuits that have concluded that a non-self-executing treaty, even if implemented by statute, may not be applied directly in U.S. courts.

## A.

The court's effort to frame this case as a conflict between the Convention itself and Louisiana law puts the cart before the horse by failing to consider basic preemption doctrine before analyzing the McCarran-Ferguson Act.

---

Convention Act), that we construe to supersede Louisiana law."); see also Op. at 13–14 ("The fact that a treaty is implemented by Congress does not mean that it ceases to be a treaty and becomes an 'Act of Congress.'" (footnote omitted)).

[6] Compare Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's London, 543 F.3d 744, 753 (5th Cir. 2008), vacated and reh'g granted, 558 F.3d 599 (5th Cir. 2009), with Op. at 4–5 ("[T]he McCarran–Ferguson Act does not apply to the Convention. . . ." (emphasis added)); Op. at 18 ("Because here the Convention, an implemented treaty, rather than the Convention Act, supersedes state law, the McCarran–Ferguson Act's provision that 'no Act of Congress' shall be construed to supersede state law regulating the business of insurance is inapplicable.").

[7] Despite the court's belief that it "need not and do[es] not undertake to determine the precise or technical contours of how or whether implemented non-self-executing treaty provisions become the 'Law of the Land' under the Supremacy Clause," Op. at 22, that is what it necessarily must do in order to justify framing its approach as an inquiry into whether the Convention itself is an "Act of Congress." See infra Part II.

Fundamentally, this is a Supremacy Clause case. See Munich Am. Reinsurance Co. v. Crawford, 141 F.3d 585, 590 (5th Cir. 1998) ("Ordinarily, federal law preempts conflicting state law by virtue of the Supremacy Clause. The McCarran-Ferguson Act reverses that effect . . . ." (citation omitted)). From the perspective of the Supremacy Clause, Louisiana Revised Statute § 22:629[8] applies unless the Underwriters carry the burden to show that some specific source of federal law preempts it.[9] If the proposed preemptive law is a statute like the Convention Act, then the McCarran-Ferguson Act applies. If the proposed preemptive law is the Convention itself, then the court is correct that McCarran-Ferguson does not apply. But there is still no preemption—and the district court must be affirmed—unless the Convention is actually capable of superseding § 22:629 as a matter of Supremacy Clause law. It is not.

A crucial distinction between a self-executing treaty and a non-self-executing one is that the former, but not the latter, can provide a judicially-enforceable source of preemptive law under the Supremacy Clause. Beginning with Foster v. Neilson 27 U.S. (1 Pet.) 253, 315 (1829), and as recently as Medellin v. Texas, 128 S. Ct. 1346 (2008), the Supreme Court has repeatedly affirmed that only self-executing treaties operate by their own force to provide a rule of decision in the courts.[10] Non-self-executing treaties, in contrast "can

---

[8] Effective January 1, 2009, § 22:629 has been renumbered § 22:868. See La. Rev. Stat. Ann. § 22:868 (Special Pamphlet A 2009). The provision was numbered § 22:629 at all times relevant to this suit.

[9] See AT&T Corp. v. Public Utility Comm'n of Tex., 373 F.3d 641, 645 (5th Cir. 2004) ("The burden of persuasion in preemption cases lies with the party seeking annulment of the state statute.") (citing Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 230 (3d Cir. 2001)).

[10] There is an argument, based on the text of the Supremacy Clause, that the Constitution should not recognize two species of treaty. After all, the clause provides that the

only be enforced pursuant to legislation to carry them into effect." Id. at 1356 (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888)). In Whitney, the Supreme Court described the self-executing/non-self-executing distinction as follows:

> A treaty is primarily a contract between two or more independent nations . . . . When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment.

124 U.S. at 194. The Court then described the Supremacy Clause implications of self-executing treaties having equal standing with statutes.[11] Similarly in the Head-Money Cases, the Court distinguished purely international obligations flowing from non-self-executing treaty provisions from domestic obligations, recognized by the Supremacy Clause, flowing from self-executing treaty provisions.[12] In Medellin, the petitioner asserted that an International Court of

---

"Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby." U.S. Const. art. VI, § 2, cl. 2 (emphasis added). But this interpretation has not prevailed.

[11] See Whitney, 124 U.S. at 194 ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other: provided, always, the stipulation of the treaty on the subject is self-executing." (emphasis added)).

[12] The Court stated the following regarding the distinction between international obligations and domestic obligations recognized by courts:

44

Justice ruling was binding in United States courts because, "by virtue of the Supremacy Clause, the treaties requiring compliance with [the ruling] are already the Law of the Land." 128 S. Ct. at 1356 (emphasis and internal quotation marks omitted). The Court rejected this argument because it found the treaties to be non-self-executing. Id. at 1358–61.

Therefore, treaties come in two separate and distinct types: self-executing treaties, which can undoubtedly preempt state law in a case like this, and non-self-executing treaties, which cannot. The court brushes away this key distinction, declining to hold that the Convention is self-executing, but nevertheless stating that "the Convention, an implemented treaty, rather than the Convention Act, supersedes state law." Op. at 18 (emphasis added); see also Op. at 4–5 ("[T]he McCarran–Ferguson Act does not apply to the Convention."

---

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

Edye v. Robertson (Head-Money Cases), 112 U.S. 580, 598 (1884). The Court then noted, in contrast, that self-executing treaty provisions are a proper subject of the Supremacy Clause:

> But a treaty may also contain provisions . . . which are capable of enforcement as between private parties in the courts of the country . . . . The constitution of the United States places such provisions as these in the same category as other laws of congress by its declaration [in the Supremacy Clause] that 'this constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.'

Id. at 598–99 (emphasis added).

(emphasis added)); Op. at 16 ("[I]t is a treaty (the Convention), not an act of Congress (the Convention Act), that we construe to supersede Louisiana law.").

The court does not dispute that a non-self-executing treaty provision, of itself, has no legal force in domestic courts, and therefore no preemptive force, while a self-executing provision does. It concludes, however, that upon implementation by statute, a non-self-executing treaty is promoted to the Supremacy Clause status it would have enjoyed had it been self-executing. In this view, a treaty is a treaty. Under this view, a non-self-executing treaty requires an additional step to become binding, but once that step is passed—once the treaty is implemented—it is the Supremacy Clause equivalent of a self-executing treaty. The court, therefore, holds to the idea that a treaty, rather than an "Act of Congress," causes the conflict in this case, repeatedly asking whether "the Convention" supersedes Louisiana law.

But that is wrong. The court points to no case holding that a non-self-executing treaty can supersede state law. See David Sloss, The Domestication of International Human Rights: Non-Self-Executing Declarations and Human Rights Treaties, 24 Yale J. Int'l L. 129, 149 (1999) ("[T]o the best of the author's knowledge, no U.S. court has ever held a treaty provision to be non-self-executing and then applied it directly to decide a case."). Furthermore, there is no argument that Foster, Medellin, or any similar case supports such a result. Simply put, implementing legislation—even if it fully implements a treaty—does not promote a non-self-executing treaty to the Supremacy Clause status it would have enjoyed had it been self-executing. As a matter of directly applicable domestic law, the non-self-executing treaty remains as inert as a

provision of a model code, a source of content incorporated by reference.[13] As a source of law, the implementing legislation is the alpha and omega of what may constitute a rule of decision in U.S. courts. For this reason, there can be no preemption in this case without construing an Act of Congress— the Convention Act rather than the treaty.

B.

Untethered to the moorings of Supreme Court precedent, scholarly consensus in this area, or case law from other circuits, the court sets off on its course into uncharted Supremacy Clause waters. Missouri v. Holland, 252 U.S. 416 (1920), is the only Supreme Court holding upon which the court purports to ground its conclusion that the non-self-executing Convention is capable of preemption, and that courts should look to the treaty, rather than to the implementing legislation, to see if it is an "Act of Congress." But Holland's holding on the treaty power's interplay with Congress's powers under the Necessary and Proper Clause is irrelevant to the Supremacy Clause question before this court.

What is relevant to this case is not the holding of Holland, but the manner in which it frames the conflict between an implemented treaty and state law prerogatives embodied in a Missouri statute. It is clear from the first sentence of Holland that the implementing act—not the treaty—is considered the source of the conflict. See 252 U.S. at 430–31 ("This is a bill in equity brought by the State of Missouri to prevent . . . the United States from attempting to enforce the

---

[13] Of course, as a matter of international law, the United States is bound by its commitments, including those arising from non-self-executing treaties. See, e.g., Ian Brownlie, Principles of Public International Law 620 (2008) (describing the principle of pacta sunt servanda requiring nations party to a treaty to perform their obligations in good faith).

Migratory Bird Treaty Act." (emphasis added)). The Court reasoned that the treaty was constitutional under the treaty power, and therefore the act implementing it was constitutional under the Necessary and Proper Clause. See id. at 432, 435. It accordingly held that the district court had correctly dismissed Missouri's complaint "on the ground that the Act of Congress is constitutional." Id. at 431. The source of preemptive power at issue was the implementing legislation, which the Court variously referred to as an "act," id., a "statute," id. at 432, 435, and an "act of Congress," id. at 432. There is no contention or holding in Missouri v. Holland that a court could apply a non-self-executing treaty, implemented or not, to supersede state law.

Not only does Holland not support the conclusion that implementation by statute imbues a non-self-executing treaty with preemptive abilities; leading Supreme Court cases on the self-executing/non-self-executing distinction provide no support, either. Indeed, the court does not attempt to argue that Foster, Whitney, the Head-Money Cases, or Medellin, or any case interpreting any of them, supports the premise that the non-self-executing Convention is capable of "superceding" state law under the Supremacy Clause. Considering the unusual nature of the question (and before it overrules the district court and creates a circuit split), I would expect the en banc court to devote some attention to the relevant case law in this area. It fails to do so.

The court also ignores the consensus of legal scholars regarding the Supremacy Clause status of implemented treaties. In direct contradiction to the holding today, the commentators overwhelmingly conclude that under current (and longstanding) law, it is only the implementing statute, not the non-self-executing treaty, that can be enforced by the courts so as to be capable

of preemption.[14]  See, e.g., 1 Restatement (Third) of the Foreign Relations Law of the United States § 111(3) cmt. h (1986) [hereinafter Restatement] ("[S]trictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States."); Louis Henkin, Foreign Affairs and the United States Constitution 200 n.* (2d ed. 1996) ("Strictly, if a treaty is not self-executing it is not the treaty but the implementing legislation that is effectively 'law of the land.'"); Malvina Halberstam, Alvarez-Machain II: The Supreme Court's Reliance on the Non-Self-Executing Declaration in the Senate Resolution Giving Advice and Consent to the International Covenant on Civil and Political Rights, 1 J. Nat'l Security L. & Pol'y 89, 96 (2005) ("[I]t is the statute implementing the treaty that is the supreme law of the land, rather than the treaty, as provided for by Article VI  [the Supremacy Clause].");  Carlos Manuel Vázquez, Treaties as Law of the Land: The Supremacy Clause and the Judicial Enforcement of Treaties, 122 Harv. L. Rev. 599, 637 (2008) ("When a treaty is non-self-executing, judges apply the implementing statute, not the treaty itself."); Jean-Marie Simon, The Alien Tort Claims Act: Justice or Show Trials?, 11 B.U. Int'l L.J. 1, 42 n.247 (1993) ("As a technical matter, U.S. implementing legislation does not make the treaty directly applicable in U.S. courts, it only makes the implementing legislation part of U.S. law in U.S. courts, although the implementing language may [be] identical to treaty language."); Thomas Buergenthal & Sean D. Murphy, Public International Law in a Nutshell 198–99 (4th ed. 2007) ("Non-self-executing treaties, however, require legislation to implement them in the United States.  For such agreements, it is the implementing legislation, not the agreement itself, that becomes the rule of

---

[14] This includes commentators who are critical of the present state of the law and those who are not, both of whom are represented in the citations given.

49

decision in U.S. courts."); Kathleen Patchell, 10A Hawkland UCC Series § 8:22 ("[I]f a private law convention is implemented as a non-self-executing treaty, the convention itself will not become part of U.S. domestic law. Instead, it is the legislation, if any, passed to implement the convention that becomes part of U.S. domestic law."); Vincent G. Lévy, Note, *Enforcing International Norms in the United States after Roper v. Simmons: The Case of Juvenile Offenders Sentenced to Life Without Parole*, 45 Colum. J. Transnat'l L. 262, 266 n.21 (2006) ("Indeed, the preemptive power of treaties is limited to 'self-executing' treaties—the statutory provisions implementing those treaties that are not self-executing, rather than the treaties themselves, preempt U.S. state law."); cf. Henkin, *Foreign Affairs and the United States Constitution* at 209 n.* ("Since a non-self-executing treaty is not law for the courts of its own accord, any inconsistency between such a treaty and an Act of Congress is, as regards domestic law, an inconsistency between the two statutes.").

In its quest to give the Convention newfound preemptive abilities, the court similarly disregards case law from other circuits that have concluded that non-self-executing treaties lack preemptive force in U.S. courts. Indeed, the Second Circuit has so concluded with respect to the exact same non-self-executing treaty in this case. *Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41 (2d Cir. 1995).[15] Its unanimous panel did not find the issue difficult. The question

---

[15] The court contends that *Stephens* "is at least in tension" with the Second Circuit's subsequent decision in *Stephens v. National Distillers & Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1995) [hereinafter *National Distillers*]. This is not so, as the cases are easily distinguished. As the court notes, *National Distillers* held that the statute at issue in the case, the Federal Sovereign Immunities Act (FSIA), codified international law that was already a part of federal common law at the time Congress passed the McCarran-Ferguson Act. See id. at 1234 ("But it was not an 'act of Congress' that superseded [state] insurance law. International law, accepted by federal common law, had already done that before the FSIA came into being."); see also *Verlinden B.V. v. C. Bank of Nig.*, 461 U.S. 480, 488 (1983) ("For the most part, [FSIA]

presented was whether "under the Supremacy Clause the Convention supersedes the Kentucky Liquidation Act." Id. at 45. The court only needed to note that "the Convention is not self-executing" and consider the basic doctrine of Foster in order to conclude that "[t]he Convention itself is simply inapplicable." Id. The Third Circuit's decision in Suter v. Munich Reinsurance Co., 223 F.3d 150 (3d Cir. 2000), further confirms that the Convention is simply inapplicable as a source of preemptive law in the courts. As in Stephens, the court in Suter faced essentially the same issue we face. Although it described the reinsurance contracts at issue as "includ[ing] arbitration clauses governed by the . . . Convention," it framed the preemption issue in terms of whether there was a conflict between "the Convention Act" and an allegedly contrary New Jersey statute. See id. at 152, 160–62.[16] There was no suggestion that the Convention itself could supersede the statute.

The notion that non-self-executing treaties are inapplicable in domestic courts finds support in other circuits as well. In Hopson v. Kreps, the Ninth Circuit concluded in no uncertain terms that "[t]he issue in any legal action

___

codifies, as a matter of federal law, the restrictive theory of sovereign immunity."). McCarran-Ferguson was inapplicable because it would not require reverse-preemption of the identical federal common law rules that would have been in force had the FSIA never been enacted. See National Distillers, 69 F.3d at 1234. That unique circumstance is not present in this case. Furthermore, the FSIA specifies that it provides the exclusive means of suing a foreign sovereign in American courts. See 28 U.S.C. §§ 1604–1607 (foreign states are immune from the jurisdiction of American courts except as provided in §§ 1605–1607); see Republic of Austria v. Altmann, 541 U.S. 677, 691 (2004) (FSIA is "comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state. . . .'" (quoting Verlinden, 461 U.S. at 488)). By contrast, the Convention Act does not contain, nor has the Supreme Court found, a similar statement of exclusivity.

[16] The court held there was no conflict because in fact, the New Jersey statute did not preclude arbitration (or removal to federal court) pursuant to the Convention Act. See Suter, 223 F.3d at 161 ("[W]e find no potential friction between the Liquidation Act and having this controversy decided by an arbitrator.").

concerning a statute implementing a treaty is the intended meaning of the terms of the statute." 622 F.2d 1375, 1380 (9th Cir. 1980). Rather than being the star of the jurisprudential show, as the majority contends, the non-self-executing treaty takes a back seat to the implementing statute: it may be "relevant [in U.S. Courts] insofar as it may aid in the proper construction of the statute," but it "has no independent significance in resolving such issues."[17] See id. Likewise, when the D.C. Circuit addressed the interpretation of a non-self-executing treaty, Judge Kavanaugh noted in concurrence that "[s]trictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States. That is true even when a non-self-executing agreement is 'enacted' by, or incorporated in, implementing legislation." Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 879 (D.C. Cir. 2006) (Kavanaugh, J., concurring) (quoting Restatement § 111 cmt. h).

Although the court cites cases from our circuit purporting to apply the Convention rather than the Convention Act,[18] these cases stand for no such proposition. They amount to nothing more than instances of imprecise language

---

[17] Even the proposition that a non-self-executing treaty could be relevant as an interpretive aid to resolve ambiguities in an implementing act is contested. See, e.g., Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 880 (D.C. Cir. 2006) (Kavanaugh, J., concurring) (finding "little justification for a court to put a thumb on the scale in favor of a non-self-executing treaty when interpreting a statute" because such treaties "have no legal status in American courts.").

[18] See Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 902–03 (5th Cir. 2005) ("It goes without saying that, upon the United States signing a treaty and Congress adopting enabling legislation, the treaty becomes the supreme law of the land."); McDermott Int'l, Inc. v. Lloyds Underwriters of London, 120 F.3d 583, 586 (5th Cir. 1997) (refusing to decide "whether the Convention preempts La. R.S. 22:629" (emphasis added)); Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1145 (5th Cir. 1985) (holding that if an arbitration agreement qualifies, "the Convention requires district courts to order arbitration" (emphasis added)).

used in contexts where the distinction was of no consequence.[19] In the typical case, the formal distinction between the Convention and the Convention Act will not matter. When courts confront an implemented, non-self-executing treaty, the implementing act has preemptive force under the Supremacy clause rendering it irrelevant whether the treaty does as well. Where the distinction is not material, it is just less cumbersome to speak of a party's rights under a particular section of the Convention (which contains the specifics) than under the Convention Act (which merely enacts the Convention).[20] This is comparable

---

[19] In Lim, for example, employment contracts, not insurance agreements, were at issue; the McCarran-Ferguson Act was therefore not triggered and state law was preempted by federal law—as a formal matter, by the Convention Act rather than the Convention itself, but it made no difference in that case. 404 F.3d at 900–01. The formal status of the Convention was similarly irrelevant in Sedco, and the McCarran-Ferguson Act not triggered. 767 F.2d 1144–45. Although McDermott involved the same Louisiana insurance statute at issue here, it did not address the Convention/Convention Act distinction because it held that the policy was not delivered in Louisiana, and thus that Louisiana's arbitration voidance clause was inapplicable. 120 F.3d at 586.

[20] The Restatement acknowledges the practice of referring to a non-self-executing treaty, for convenience's sake, as applicable law when actually it is not. In fact, the Restatement does so itself. Section 111(3) states the basic rule regarding non-self-executing treaties:

> Courts in the United States are bound to give effect to international law and to international agreements of the United States, except that a "non-self-executing" agreement will not be given effect as law in the absence of necessary implementation.

At first glance, this appears to suggest that a non-self-executing agreement will "be given effect as law" upon implementation. Comment h, however, makes clear this is not the case:

> Under Subsection (3), strictly, it is the implementing legislation, rather than the [non-self-executing] agreement itself, that is given effect as law in the United States. That is true even when a non-self-executing agreement is "enacted" by, or incorporated in, implementing legislation.

Unlike the cases that the court cites, the present case is the rare one that requires us to be "strict" in distinguishing between the treaty and the act.

to our occasional practice of applying the Uniform Commercial Code as if it were enforceable law, when we really mean to refer to state statutes enacting the uniform provisions. See, e.g., First United Fin. Corp. v. Specialty Oil Co., 5 F.3d 944, 946 n. 2 (5th Cir. 1993) ("[B]ecause Louisiana has adopted the UCC provisions relevant herein, all sections will hereafter be cited to the UCC rather than to the specific Louisiana statute."). In the instant case, however, the distinction is not merely tangential but dispositive: the McCarran–Ferguson Act applies only to Acts of Congress, not to treaties.[21]

## II.

Perhaps the court today does not really mean to cut a new path through Supremacy Clause territory to endow non-self-executing treaties with heretofore undiscovered preemptive powers. But that is what it must do in order to justify framing its approach as an inquiry into whether the Convention itself is an "Act of Congress."[22] The alternative would be a sort of legal alchemy, in which the

---

[21] The court cites language from the Convention Act itself indicating a "proceeding falling under the convention shall be deemed to arise under the laws and treaties of the United States," Op. at 15 (quoting 9 U.S.C. § 203) (emphasis added), implying that Congress thought the Convention Act could apply directly. This argument does not undermine the consensus that non-self-executing treaties lack preemptive force in the courts. At most, this language could conceivably be relevant to determining whether Congress thought the treaty was self-executing. But assuming (as the court does) that it is not self-executing, Congress simply lacks the power to alter, by statue, constitutional decisions such as Foster, Whitney, and the Head-Money Cases, which indicate that non-self-executing treaties are not directly enforceable by the courts.

[22] Thus, it is no surprise to find the court inferring from our precedents that "implemented provisions of a non-self-executing treaty can themselves be given effect by the courts as federal law," Op. at 21 & n.54, concluding that "it is by reference to the Convention that we have a command—a judicially enforceable remedy—that we 'supersede' Louisiana law," Op. at 18, recognizing that "[i]mplementing legislation that does not conflict with or override a treaty does not replace or displace that treaty," Op. at 13, and deciding what it means for preemptive law to have "as its source an implemented non-self-executing treaty," Op. at 22.

court bestows on the Convention Act the beneficial properties of a statute (such as the power to carry an inert treaty into execution and preempt state law), but not its drawbacks (such as the need to live by rules like the McCarran-Ferguson Act that Congress has prescribed for statutes). This is plainly wrong. Because a non-self-executing treaty cannot preempt state law, the court cannot analyze the ineffectual treaty—rather than the implementing legislation—to determine the reverse-preemptive effects of the McCarran-Ferguson Act.

## A.

Two sources of law are here in conflict. The first source of law is Louisiana Revised Statute § 22:629, which bars the use of arbitration clauses in insurance disputes.[23] The Louisiana statute would normally be subject to the ordinary rules of preemption, except that it falls within purview of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–15, which bars implied federal statutory preemption of state insurance law and permits state insurance laws to reverse-preempt inconsistent federal statutes. Specifically, Congress declared in the McCarran–Ferguson Act that it intended to create a default rule preserving a state-by-state scheme for regulating insurance and providing that congressional silence on insurance regulation must not be interpreted to preempt state law. § 1011 ("Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."). The provision of the McCarran–Ferguson Act at issue in this case provides:

---

[23] Doucet v. Dental Health Plans Mgmt. Corp., 412 So. 2d 1383, 1384 (La. 1982) (holding that § 22:629 bars arbitration clauses in the insurance law context).

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance. . . .

§ 1012(b) (emphasis added). With respect to "Acts of Congress," the McCarran–Ferguson Act "impos[es] what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise."[24] U.S. Dep't of the Treasury v. Fabe, 508 U.S.

---

[24] Congress has prescribed rules of statutory construction in other statutes as well. See, e.g., 50 U.S.C. § 1547(a) (War Powers Resolution) (imposing clear statement rule for legislation authorizing introduction of United States Armed Forces into hostilities). Furthermore, the formal treaty/statute distinction the court elides today is essential in a number of other contexts. See, e.g., 18 U.S.C. § 4001(a) (Non-Detention Act) (requiring that any "imprison[ment] or det[ention]" by the United States of an American citizen be effected pursuant to an "Act of Congress"; a treaty is insufficient (emphasis added)); 28 U.S.C. § 1350 (Alien Tort Statute) ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," but not an Act of Congress) (emphasis added); War Powers Resolution, 50 U.S.C. § 1547(a)(2) (stating that specific authorization for the introduction of United States Armed Forces into hostilities may not be inferred from a treaty alone, but instead requires implementing legislation); Curtis A. Bradley & Jack L. Goldsmith, Foreign Relations Law 396 (2d ed. 2006) ("It is generally accepted that treaties may not by themselves create domestic criminal liability in the United States"; statutes are required)); 1 Restatement (Third) of Foreign Relations Law of the United States § 111, cmt. i (1987) [hereinafter Restatement] ("It has been commonly assumed that an international agreement [e.g., a treaty] cannot itself bring the United States into a state of war."); Edwards v. Carter, 580 F.2d 1055, 1058 (D.C. Cir. 1978) ("Thus, [by virtue of U.S. Const. art. I, § 9, cl. 7] the expenditure of funds by the United States cannot be accomplished by self-executing treaty; implementing legislation appropriating such funds is indispensable. Similarly, the constitutional mandate that 'all Bills for raising Revenue shall originate in the House of Representatives' [U.S. Const. art. I, § 7, cl. 1] appears, by reason of the restrictive language used, to prohibit the use of the treaty power to impose taxes."). "The treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, 'to make Treaties.'" United States v. Lara, 541 U.S. 193, 201 (2004) (quoting U.S. Const., art. II, § 2, cl. 2).

491, 507 (1993). Thus, at least as an initial matter, this provision of Louisiana law is protected by the McCarran–Ferguson Act.

The court errs on the question whether the second source of law in this case constitutes an "Act of Congress." If it does, then like all Acts of Congress that do not "specifically relate[] to the business of insurance," it is subject to reverse-preemption by state law under McCarran–Ferguson; if it is not an Act of Congress but rather some other source of federal law, like a self-executing treaty, then McCarran–Ferguson does not apply, and the Louisiana law would be preempted by straightforward application of the Supremacy Clause.

The Convention, as a non-self-executing treaty, cannot itself provide the rule of decision here, so the Convention Act must be the second source of law.[25] This was the conclusion reached by the Second Circuit in Stephens. Stephens v. Am. Int'l Ins. Co., 66 F.3d 41 (2d Cir. 1995). In determining whether Louisiana state law was preempted under the McCarran-Ferguson Act, the court looked to the implementing statute, not the treaty. Unlike the court today, the Stephens court found that "[t]he Convention itself . . . simply inapplicable in this instance" as the implementing legislation was the federal law of consequence. Id. Likewise, this court should have looked to the statute, rather than the treaty, to determine if Louisiana law had been preempted by an "Act of Congress" as required by McCarran–Ferguson.

B.

---

[25] Once we remove the Convention as a possible source of preemption, then this case is no different from Munich American Reinsurance Co. v. Crawford. 141 F.3d 585 (5th Cir. 1998). In Munich, the court looked to the Federal Arbitration Act as the source of federal law that conflicted with an Oklahoma law governing insurance delinquency proceedings, and found that the Oklahoma Law reverse-preempted the Federal Arbitration Act under the McCarran–Ferguson Act. Id. at 596. If the Convention Act is all that is left to preempt, it is reverse-preempted just as the FAA was in the previous case.

The court justifies its decision to look to the Convention rather than the Convention Act on the ground that the Convention Act implements the Convention largely by reference, as opposed to setting out the Convention provisions within the text of the Act.[26] Op. at 16. The court proposes that "the Convention Act does not . . . operate without reference to the contents of the Convention." Id. Because a court applying the Convention Act must also consult a reference copy of the Convention to ascertain the conflict with Revised Statute § 22:629, the court argues that it is the Convention, rather than the Act, that is "construed" under the McCarran–Ferguson Act. This supposedly insulates the preemptive provisions from McCarran-Ferguson, which reaches only statutes, not treaties.

This argument is essentially a play on words, which wrenches the word "construe" from the verb phrase in which it appears in the statute:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b). The relevant phrase is "construe[] to invalidate, impair, or supersede." Thus, "construe" does not merely mean to refer to the text for content. The plain meaning of "construe . . . to supersede any law enacted by any State" is to give preemptive force, to apply the source of law in question rather than state law. Accordingly, to merely "operate with[] reference to the

---

[26] Congress incorporated the substance of the treaty in the implementing Act of Congress largely by reference. See, e.g., 9 U.S.C. § 201 ("The Convention . . . shall be enforced in United States courts in accordance with this chapter.").

contents" of the Convention—to merely have a copy handy and refer to it—is not to "construe" the Convention in the McCarran-Ferguson sense.[27]

The contention that we are not truly "construing" the Convention Act because we must resort to the language of the Convention to do so is logically unsupportable and foreign to the case law. The other circuits to address this question have discussed the interaction between a non-self-executing treaty and its implementing legislation to varying degrees, depending in part on the relevance of the distinction to the case's outcome. None have suggested that the Convention Act's failure to cut-and-paste the language of the treaty into the statute somehow prevents the statute from being an "Act of Congress," capable of being "construed." See Missouri v. Holland, 252 U.S. 416, 424, 430, 431, 432, 435 (1920) (discussing the source of law at issue as an "Act of Congress," an "act of Congress," an "act," and a "statute," and addressing solely the question whether the Act of Congress preempted state law, not whether the treaty itself did); Stephens, 66 F.3d at 45 (holding "[t]he Convention itself . . . simply inapplicable in this instance"); Suter v. Munich Reinsurance Co., 223 F.3d 150, 160–62 (2d Cir. 2000) (analyzing the Convention Act, rather than the Convention itself, as the source of law at issue); Hopson v. Kreps, 622 F.2d 1375,

---

[27] Our cases further confirm that the phrase "construed to invalidate, impair, or supersede" entails applying federal law to invalidate, impair, or supersede state law. See Miller v. Nat'l Fid. Life Ins. Co., 588 F.2d 185, 186–87 (5th Cir. 1979) ("The McCarran-Ferguson Act precludes the application of federal laws if, as a result, laws of a state regulating insurance would be invalidated, impaired, or superseded." (emphasis added)); Am. Heritage Life Ins. Co. v. Orr, 294 F.3d 702, 708 (5th Cir. 2002) ("Appellants fail to identify any statute that would be impaired, invalidated, or superseded by the application of the FAA") (citing Miller, 588 F.2d at 187) (emphasis added)); Crawford, 141 F.3d at 594 ("We must next consider whether the [federal statute] operates to 'invalidate, supersede, or impair' [the state statute]." (emphasis added)); accord Humana Inc. v. Forsythe, 525 U.S. 299, 307 (1999) ("This case . . . turns on the question: Would RICO's application to the employee beneficiaries' claims at issue invalidate, impair, or supersede Nevada's laws governing insurance?" (emphasis added)).

1380 (9th Cir. 1980) (although it "is relevant insofar as it may aid in the proper construction of the statute," a non-self-executing "treaty has no independent significance in resolving such issues.").

Commentators also agree that regardless of whether one must refer to a separate treaty text, or whether instead that text is set out in the implementing statute itself, it is the statute, not the treaty, that courts apply. See, e.g., Carlos Manuel Vázquez, The Separation of Powers as a Safeguard of Nationalism, 83 Notre Dame L. Rev. 1601, 1617 (2008) ("When a court gives effect to a treaty because it is instructed to do so by a statute, it is applying the statute, not the treaty."); Tim Wu, Treaties' Domains, 93 Va. L. Rev. 571, 588 (2007) ("When Congress implements a treaty through a statute, the statutory regime completely replaces the treaty as a basis for direct enforcement. That is, judges do not return to the original text of the treaty as a law they can enforce directly.").

In the end the court does not see the "operate with[] reference to the contents" theory all the way through. The court does not merely look to the Convention in order to fill gaps in the language of the Convention Act. Rather, the opinion makes clear that the court means to apply the Convention directly, as if it had preemptive force. For the reasons given in Part I above, it is not possible to "construe [the Convention] to supersede" anything, because the Convention is incapable of providing a rule of decision in a U.S. court. Louisiana law governs unless some applicable source of federal law can preempt. The treaty cannot do so. Therefore, the only remaining candidate is the Convention Act.

III.

Only a single statutory interpretation question remains: is the Convention Act an "Act of Congress" within the meaning of the McCarran–Ferguson Act? We can answer this question by setting forth the opening words of the Act itself:

UNITED STATES STATUTES AT LARGE
91ST CONGRESS - 2ND SESSION
Convening January 19, 1970

An Act

To implement the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards.

Pub. L. No. 91-368, 84 Stat. 692 (1970) ( emphasis added).

This is an Act of Congress. The legislation is plainly labeled as an Act of Congress, and no ambiguity on this point is cited by the court or by the parties. "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" BedRoc Ltd. v. United States, 541 U.S. 176, 183 (2004) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–254 (1992)). "[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." Id. (citing cases) (emphasis added). In addition, as discussed at length in Part I, the Supreme Court recognizes the implementing legislation of a non-self-executing treaty as an Act of Congress. Missouri v. Holland, 252 U.S. 416, 430, 431, 432, 435 (1920). Therefore, the court's exercise in statutory interpretation should have ended with the plain language of the statute, and its foray into the realm of policy considerations is improper.

Because the court is convinced that the straightforward interpretation of the words "Act of Congress," would produce an "untenable" result, the court's

analysis veers off course into a fruitless search for Congress's true intent. As a result, the court ends up supplanting the plain meaning of the unambiguous term "Act of Congress" with a strained interpretation aimed at protecting important federal policies.

First, the court resorts to speculation about what Congress must have had in mind when it included the words "Act of Congress" in the reverse-preemption provision of the McCarran–Ferguson Act. The court concludes that "there is no apparent reason . . . why Congress would have chosen to distinguish in the McCarran–Ferguson Act between treaties that are self-executing and those that are not self-executing but have been implemented." Op. at 14. It therefore considers it "unlikely" that in passing McCarran–Ferguson, Congress "intended any future treaty implemented by an Act of Congress to be abrogated to the extent that the treaty conflicted . . . with a state law regulating . . . insurance if Congress's implementing legislation did not expressly save the treaty from reverse-preemption." Op. at 24–25.[28]

This interpretation contradicts the plain language of the McCarran-Ferguson Act. In the Act, Congress prescribed a clear-statement rule for federal statutes affecting the business of insurance: uncertain provisions are to be construed not to preempt state insurance law. See generally U.S. Dep't. of

---

[28] There is a vague suggestion in these passages that the court still holds to the panel's conception of the treaty and its implementing legislation as somehow conglomerated. Because no such chimera exists in our law, it is reasonable to assume that Congress did not have it in mind when it passed the McCarran–Ferguson Act. However, this is irrelevant to statutory interpretation because we are to look to what Congress said, not to what Congress may or may not have had in mind.

Furthermore, any theory based on a hybridized treaty-statute loses track of the basic character of this case. It is a preemption case, and preemption requires a source of federal law capable of displacing state law. If the Convention cannot do so, and the McCarran–Ferguson Act prevents the Convention Act from doing so, then no hybrid of the two can do so.

Treasury v. Fabe, 508 U.S. 491, 507 (1993). In fact, Congress explicitly determined that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." § 1011. It is possible that Congress intended this policy judgment to control the interpretation of Acts of Congress generally, whether or not they implemented treaties. It is also possible that Congress never considered whether Acts of Congress implementing treaties ought to be subject to the clear-statement rule of McCarran–Ferguson. It does not matter which, if either, of these narratives is correct. Such speculation has no place when we interpret a statute to say what it means and mean what it says. BedRoc, 541 U.S. at 183; see also Green v. Biddle, 21 U.S. 1, 89–90 (1823) ("[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense."). There is a lively debate in the judiciary and the legal academy over the universe of interpretive methods properly available to a court where the text of a statute is unclear, but that debate is irrelevant here. How much clearer than "No Act of Congress" can Congress be?

The court contends that reading the words "Act of Congress" to include the Convention Act is "untenable," and states that it does "not consider it reasonable" to embrace such a reading of the statute. Op. at 14–15. Yet there is no citation to any rule of construction that would make these judgments relevant to the interpretive task, as policy-based interpretive techniques have no place in the court's analysis where the language of the statute is clear.[29]

---

[29] The court acknowledges that "the starting point for interpreting a statute is the language of the statute itself." Op. at 5 & n.9 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)). It cites no further interpretive rules in support of its reasoning, other than citing United States v. Percheman, 32 U.S. 51, 89 (1833) for the

Where the statutory text is unambiguous, "there is neither need nor warrant to look elsewhere." Am. Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 459 (5th Cir. Unit A Oct. 1981) (emphasis added). "A court should depart from the official text of the statute and seek extrinsic aids to its meaning only if the language is not clear or if apparent clarity of language leads to absurdity of result when applied." Id. (emphasis added and citation omitted). In light of such clear directives, the court's approach is aberrant.

In addition to the court's improper inquiry into what Congress intended when it wrote the unambiguous words "Act of Congress," the court expounds for some length–indeed for an entire section–upon the federal policies protected by its interpretation. See Op. at 26–28 ("Our conclusion that referral to arbitration is proper in this case is bolstered by the congressionally sanctioned national policy favoring arbitration of international commercial agreements."). But in light of a clearly worded statute, this factor cannot support the weight that the court's analysis forces it to bear. Indeed, even if such policy considerations were relevant to the interpretation of an unambiguous statute, and they are not, the court's analysis barely acknowledges the state interest that was significant

proposition that "[t]he understanding of the article [of a treaty] must enter into our construction of the acts of [C]ongress on the subject." Percheman is at most relevant to interpreting the Convention Act. It has no bearing on the interpretation of the phrase "Act of Congress" as it appears in the McCarran–Ferguson Act, which is not an implementing act for a treaty.

    Neither the parties nor the court contends that the canon of constitutional avoidance, see Ashwander v. TVA, 297 U.S. 288, 345–46 (1936) (Brandeis, J., concurring), or the canon of avoiding absurd results, see United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543–44 (1940), applies here. The unambiguous nature of Congress's language in the McCarran–Ferguson Act likewise precludes application of the Charming Betsy canon, which favors interpretations of unclear statutes that help the United States meet its treaty obligations over those that do not. Murray v. Schooner Charming Betsy, 6. U.S. (2 Cranch) 64 (1804).

enough to give rise to the rare reverse-preempting provision of the McCarran–Ferguson Act in the first place.[30]

IV.

In summary, I would follow the holding of the Second Circuit (the only circuit to have squarely decided this question) in Stephens. In a domestic court, a treaty that Congress enacts is not law itself, and in fact it is the statute that counts and the statute amounts to a standard congressional act.

I would hold that:

---

[30] Congress, in enacting McCarran–Ferguson, explicitly stated that "continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. §1011. McCarran–Ferguson was a response to a Supreme Court decision interpreting the Sherman Act to apply to the business of insurance, "thereby interfering with state regulation of insurance in...unanticipated ways." Barnett Bank of Marion Co., N.A. v. Nelson, 517 U.S. 25, 40 (1996). Congress therefore "moved quickly" to enact the statute "to restore the supremacy of the States in the realm of insurance regulation" by protecting state regulation from inadvertent Congressional interference. U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993) (emphasis added). Recognizing this strong state interest, the Supreme Court has observed that "[o]bviously, Congress's purpose [in enacting the statute] was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429 (1946).

1.    The non-self-executing Convention[31] cannot itself provide a rule of decision

---

[31]  We cannot hold that the treaty is self-executing because no party asks us to do that. Our en banc holdings establish that we reach only the issues properly brought to the panel and the court en banc.  United States v. Brace, 145 F.3d 247, 255–61 (5th Cir. 1998) (en banc) ("It bears repeating—indeed, cannot be overemphasized—that we do not address issues not presented to us."); Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 280 n.32 (5th Cir. 2005) (en banc) ("In its en banc brief, Louisiana mentioned a relatedness challenge to § 2000d-7, but that argument was not presented to the panel, and Louisiana's en banc brief fails to develop it beyond a bare assertion.  Thus, Louisiana has waived its relatedness challenge."); Atwater v. City of Lago Vista, 195 F.3d 242, 245 n.3 (5th Cir. 1999) (en banc), aff'd, 532 U.S. 318 (2001); United States v. Johnson, 718 F.2d 1317, 1325 n.23 (5th Cir. 1983) (en banc).   The Underwriters failed to properly preserve a self-execution argument at both the panel and en banc stages.

At the panel stage, the Underwriters failed to press for such a holding, mentioning the argument only in a footnote of their merits brief.  Appellant's Brief 33 n.17; see Davis v. Maggio, 706 F.2d 568, 571 (5th Cir. 1983) ("Claims not pressed on appeal are deemed abandoned."); Miller v. Tex. Tech Univ. Health Sci. Ctr., 421 F.3d 342, 348–49 (5th Cir. 2005) (en banc) (taking an en banc brief's "bare assertion" as forfeiture); F.D.I.C. v. Mijalis, 15 F.3d 1314, 1326–27 (5th Cir. 1994) ("intimat[ing]" is not "press[ing]"); see also Blumberg v. HCA Mgmt. Co., 848 F.2d 642, 646 (5th Cir. 1988) ("[W]e have repeatedly held that we will not consider alleged errors raised only [in the reply brief]."). Indeed, as the court today notes, the Underwriters' briefs addressed the self-execution argument without "any depth." Op. at 11. And of course, whether the now-vacated panel opinion addressed the argument is of no consequence to the court's determination at this stage.  See Brace, 145 F.3d at 256.

At the en banc stage, the Underwriters explicitly waived their self-execution argument. The court recognizes that "[t]he Underwriters addressed whether the Convention is self-executing only in briefs to the panel." Op. at 11 (emphasis added).  But more importantly, the Underwriters' en banc reply brief actually disclaims any desire to have the court hold that the treaty is self-executing:

> The question before the Court is not whether the Convention is self-executing or what preemptive effect, if any, an unimplemented non-self-executing treaty would have on a conflicting state law.  The question is what preemptive effect a later-in-time, implemented treaty has on conflicting state law.

Appellant's En Banc Reply Brief 6–7.  If we take the concurrence's suggestion and look to "the section heading preceding that language," Concurrence at 2 n.2, the inference is no different, for there again the Underwriters present the treaty as non-self-executing: "LSAT Avoids Answering the Question Posed by the Panel – Why Should an Implemented Non-Self-Executing Treaty Be Treated Any Differently Than a Self-Executing Treaty?" Appellant's En Banc Reply Brief 6.

The concurrence urges us to look at LSAT's en banc brief to determine whether or not the Underwriters presented the issue.  Concurrence at 1–2 n.2.  Rather than look to LSAT's

for U.S. courts; only its implementing legislation is capable preempting state law.

2.  The Convention Act implementing the Convention is an Act of Congress that does not "specifically relate[] to the business of insurance";

3.  The McCarran–Ferguson Act provides that "No Act of Congress" preempts state law unless the Act of Congress "specifically relates to the business of insurance";

4.  The Louisiana statute is "a[] law enacted by a[] State for the purpose of regulating the business of insurance" that the Convention Act would "invalidate, impair, or supersede";

5.  The Convention Act is therefore reverse-preempted by the Louisiana statute by operation of the McCarran–Ferguson Act; and

6.  Accordingly, the district court correctly ruled that no federal law prevents Louisiana Revised Statute § 22:629 from applying in this case.

\*          \*          \*          \*          \*          \*

brief for the Underwriters' argument, we could have just asked the Underwriters what they had briefed.  And, in fact, we did:

> Q:    That the clause is self-executing, section three, is that somewhere in your brief?

> A:    In the en banc briefs, we did not go into that issue, Your Honor, no we did not.

Recording of Oral Argument, Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's London, ___ F.3d ___ (5th Cir. 2009) (en banc), http://www.ca5.uscourts.gov/OralArgRecordings/06/06-30262_5-21-2009.wma.

Accordingly, we cannot reverse the trial court by holding that the treaty is self-executing because the Underwriters first forfeited and then waived the argument, and "it is not for us to decide which issues should be presented, or to otherwise try the case for the parties," Brace, 145 F.3d at 256.

The court today has declined the opportunity to align itself with the Second Circuit and the Supreme Court's jurisprudence in this area. It has muddied the waters of our statutory interpretation jurisprudence, by reasoning on an ad hoc basis from its own conception of what is "reasonable," or "[]likely" for Congress to have intended, rather than looking to what Congress said. Simultaneously, with little doctrinal discussion, it has applied a non-self-executing treaty as domestic, preemptive law in an unprecedented manner. As a result, "at least until our superiors speak, we leave the state of the law in [Supremacy] Clause purgatory." Green v. Haskell Co. Bd. of Comm'rs, 574 F.3d 1235, 1245 (10th Cir. 2009) (Gorsuch, J., dissenting from denial of rehearing en banc) (citation and internal quotation marks omitted).

Respectfully, I dissent.